D. C. V. A Mexican Corporation Appellate. Ms. Schwimmer for the appellate, Ms. Chapman for the athletes. Ms. Chapman. Good morning. Your Honors, may it please the Court, Martin Schwimmer of Leeson Ellis for appellant Productos Lacteos Tocumbo, known as ProLacto. Good morning. I'd like to reserve five minutes. This is an important case of first impression. This is the first time that this circuit is being asked to evaluate Section 43A, subsequent to the Supreme Court's decision in Lexmark v. Static Control. This is an opportunity for this Court to further the consumer protection goal of the Lanham Act because a certain class of plaintiffs have been, up until now, somewhat erroneously excluded from being able to bring a passing-off action under 43A because of the requirement that a plaintiff have to own a trademark that was used in U.S. commerce. The major legal issue that I wanted to talk today is the evaluation of 43A1, and there are interrelated factual issues. The holding as to bad faith or lack thereof, the holding as to inherent distinctiveness of the wordmark, and the District Court's finding as to strength of the mark. With regards to the analysis of 43A1, subsequent to trial, the Fourth Circuit in Valmora v. Bexar was asked to evaluate 43A1A in a situation where the plaintiff, Baer of Mexico, alleged that an American company had adopted the mark Flanax and had targeted Baer of Mexico's packaging. Baer indicated to that court that it would not ever use its Flanax mark in U.S. commerce. Valmora argued that under 43A1A, Baer could not bring such an action because of the requirement that it have a prior U.S. trademark, and it is accurate to say that prior to that decision, the general rule was that trademark infringement and passing-off and false designation was a two-element tort, likelihood of confusion, but also ownership of a prior trademark. The Fourth Circuit held that this is not the case, and they noted as a first point that there are a line of cases that do not require a passing-off plaintiff to own a trademark. In this circuit, in the Blinded Veterans case, this circuit showed a sympathy towards passing-off cases such as Singer's Sewing Machine, Shredded Wheat, where the plaintiff did not have a traditional trademark. When discussing this case in footnote 66 of its decision, the district court, and this is docket 339, page 139, the district court distinguished Valmora for two reasons. It basically said, well, it accurately noted that in this case, ProLacto has been utilizing the mark, while in Valmora, Mexico Baer had indicated it would not ever. They said for that reason, also, they said we can't deal with a case that has an infringing senior, an infringing junior user. That's one of the reasons they distinguished Valmora. The other reason has to do with they felt that ProLacto would not be able to establish the sort of injuries that Baer had alleged. The reason for that is we weren't called upon to do it. We didn't need to. The reality is that we would have as greater injuries as Baer would, plus more, because we're using or want to use in the United States. The injuries that are discussed in Valmora are somewhat peripheral, injuries that occur in Mexico that, because of transit across the border, perhaps someone is confused in a Mexico City drugstore. Because we have a Mexican nationwide business in, for example, 50 locations in Tijuana, we would have the same types of cross-border injuries that Baer do, but we have a whole different class of injuries. We are foreclosed from entering many markets in the United States. We have an American business that can suffer U.S. sales. So as to the fact that we are a user while Baer is not, I would say that that makes us a more attractive candidate for the Valmora course. There's going to be greater situations where U.S. consumers are potentially deceived. I understand that even under Valmora you have to show injury as part of your cause of action. Absolutely. I'm just going to tell you my concerns so you understand you can address them as you see fit, both on the false advertising and the false association aspects of the case. The district court found you have not shown injury. You have to show injury to be able to support the claims in both places, and you really don't address that. You didn't address it below. On the false association, as best I understand your argument, you're saying, well, you got misled by the district court and therefore you didn't do what you were required to do, and you want to remand to be able to do that. And all these other questions about bad faith, et cetera, assume you're right on all of it. The problem I have with the record as I'm looking at it is I don't find any proof of injury, which is your burden. On either side, false advertising or false association. And Lexmore clearly requires that. You have to show as a complaining party that there has been injury. I'm just explaining my concerns. So we have no dispute about the analysis, the legal analysis. With regards to footnote 66, the sort of injuries that the district court says Prolactive did not show under a Belmore analysis, it's not a question of being misled. It's a question of they would not have been part of the case because the trial existed prior to the existence of the Bear v. Belmore case. So we're not necessarily going to say or attempt to show that, for example, our Tijuana stores are injured by this. So with regards to the specific injuries that are identified in footnote 66, it's not a question of misled. It's that they weren't part of the case, but that inherently we would be able to show on remand if those sorts of injuries were requested. So you don't dispute that it's not in the record. Your point is in light of intervening Fourth Circuit law that we should give you another opportunity. Remand to the district court for examination of a category of injury that you did not at the time believe was legally relevant to show. Yes. In a nutshell, that is it. And it comes into the nature of the proof in certain ways. So, for example, the descriptiveness objection occurs as of the facts in Texas 2005. Because of the determination that we would have needed a prior U.S. trademark, that was the first market where we potentially had the prior trademark. So the court asks, do we have secondary meaning? And we say that that's error. Even that question was error under our alternative theory. But that's your alternative theory. That's an alternative theory, but that is one of the ways in which the legal determination to not look at California in 1991 shaped the record and shaped the district court's evaluation of the record. Speaking to Judge Edwards' basic point, we, for example, proffered evidence of actual confusion in the Houston market. If we're deemed to be the prior user, one can assume that there's damage to reputation and lost sales in the Houston market, for example. So I actually believe that the record shows the potential for normal injuries in U.S. commerce from the markets in which both sides. That's where I guess I'm confused. I don't know where the record shows the injury. It seems to me if you're trying the case, you try it on a theory that you think is correct. The district court says, I'm going to block you. I don't buy the Balmora. And then you come on appeal and say, we put in the proof of injury. And the district court's wrong in limiting us on the Balmora. That's incorrect. And we have shown injury pursuant to a legal theory that we think is correct and including the Fourth Circuit's notion. I don't know how you wait and say, respectfully, I don't know how you can argue, well, we were confused because we think the district court was confused about the law. It seems to me each side has to present the case as they think it is required or allowed to be presented under the laws they view it. And then if you have to go on appeal, you go on appeal. We are not contending that the district court was confused or misled. The district court evaluated the concepts that we were doing and it entertained it under the law at the time. So, for example, at summary judgment, it is partial to considering a fame theory. And, for example, there is evidence, it was proffered, it's the truffle pig discussion in summary judgment where there is an extensive amount of evidence that refers to reputation in Mexico and the state of plain Mexico up until 1991, the adoption. The court doesn't evaluate that evidence and hold it to a standard of is there fame as that term is understood under Grupo Gigante. It's saying, well, is there 50% recognition among the household? Belmort doesn't exist at that time and that evidence is put to the side. The evidence of whether we have so many stores in Mexico is no longer going to be relevant at trial when they're making a descriptiveness evaluation as of 2005. But, Mr. Schremer, wouldn't the evidence have to be much more than we have so many stores in Mexico? It would have to be about consumer understandings, consumer confusion. I mean, there's an argument that having the U.S. business would be helpful to your business, your client's business. So one needs factual information on this kind of issue, not just a legal theory that opens the way to factual information. Your Honor, I believe that there is evidence in the record that was not evaluated by the district court with regards to reputation. The evidence that we tried to emphasize in our brief and that did not get evaluated in the district court decision was, for example, Ignacio Gutierrez, the founder of PLM, saying, I adopted the mark because I believe that my customers would recognize it. I turn your attention to the depiction of the push cart in both sides' statements of facts. A push cart in 1991, which states, Aura Endless Estatus Unidos. They adopted the mark because they believed, PLM believed, that consumers in California would recognize that mark. But you're really swimming upstream on that because the district court also found that it wasn't a mark, ProLacta's mark, that as the brothers said, they went to Mexico, there were diffuse and many different businesses that were selling something, and they thought it was a recognizable Chicago-style pizza, a recognizable type of product, but not distinctive. So you're also asking us to, I understand, you're challenging that as well, and you would have to win on that for what you just said to actually be supportive of your claim. I'd like to answer the pending question while simultaneously reserving time for rebuttal. For example, you indicated that the district court said that the mark didn't function as a mark because it was diffuse in Mexico. Respectfully, I don't believe that that is an evaluation that the district court can make, to the extent that it is a legal evaluation as to what constitutes a mark in Mexico. What occurred is that there's testimony that there was, in the words of some of the founders, a La Michoacana palateria on every block in certain cities and in every town. They go to a supplier, and the supplier says, are you aware that there's this one big company, La Michoacana? And then they return, and that's when they adopt the mark. So the district court makes an evaluation as to the credibility of intent, and I appreciate that this court is going to be reluctant to overturn a credibility determination that the brothers made. However, we are suggesting that the overwhelming evidence suggests that is clear error, but also the descriptiveness is made as of Texas in 2005 and not evaluating the push card in 1991, Ignacio's testimony in 1991, Rubin stating we had brand recognition in the early 90s. So we believe that these factual findings are themselves clear error, but also would be vacated. The arguments that you now rely on in Belmora were available to you at trial, weren't they? I respectfully disagree.  They had them in Belmora. The single line of cases did exist which said that they could bring a passing-off claim without a trademark. However, the second part of that, that there was a reputation in U.S. commerce, that is what the Belmora court wrote out. And that was new, that had never occurred to anyone before, that wasn't an argument you could have made? The problem of reputation with that use occurs a lot, and that's why this is an important case, and this has been vexing courts for a long time, and the first line of attack has been a famous mark doctrine, which we are not arguing, because this fact pattern arises. When Bayer tried it, it correctly pointed out that the single line of cases suggests that you don't need a prior trademark. And what Belmora creates, what Lexmark creates, is the method of reading Section 43A by turning to Section 45. In Section 45, that first interest is the deceptive and misleading use of marks in such commerce. The other four interests explicitly or implicitly identify the sort of person that Congress intended to bring that case. You can see either registrants or treaty members or whatever, but as the Belmora court notes by reading that first section, the deceptive and misleading use of marks in such commerce, Justice Scalia says, it doesn't say anything really about what a plaintiff needs, and they were specific in the other things and not specific here. So under that ground, you do not need to require. So it's correct that when this case was being argued, we're certainly arguing all of these cases, and the district court is entertaining the various exceptions to the rule that you have to be prior. They certainly did evaluate those cases, the bad faith exception to T. Rose. They evaluate fame, and they say, you know, this is not binding on us. We choose not to follow it at a time that Belmora doesn't exist. And then once Belmora does exist, the district court, you know, they're handed it 12 days before they write their decision, and they're handed it, and they say, well, this is different because Pro Lacto is using in the United States, and I'm suggesting to you that that is not a reason. We'll give you back. Thank you.  May it please the court. Laura Chapman, Shepard, Mullen, Richter, and Hampton, for the appellees, who I will call the PLM entities. There is nothing for the court to do on remand. Everything has been done in the findings of fact and the conclusions of law, including a Belmora analysis, and that is done in two places in the district court's findings of fact and conclusions of law. On, at 188 F SUP 32, I'm sorry, 188 F SUP 3rd 22, that's the court's findings of fact and conclusions of law, 2016 U.S. District Lexus 69621. The court says, the district court specifically states in its findings, if the court were to hold, on page star 91, if the court were to hold that PLM was not entitled to any rights in its marks on the basis of bad faith, despite the fact it was first to use its marks in the United States, it would appear that the court would be the first to do so in the history of American trademark law. Though it is dubious of the legal validity of Proactor's Profford theory, the court will, for the purposes of its analysis, assume without deciding that the following is valid. If a party adopts a mark in the United States that has been previously used in a foreign country and engages in various forms of advertising with the intention of benefiting from the foreign user's goodwill and reputation by deceiving consumers as to the true origin of its products, even if the foreign user has never used the mark in commerce in the United States, and even if the foreign mark does not meet the requisite level of fame under the famous mark doctrine, then the party cannot obtain rights to the mark. So here you have the district court squarely addressing exactly what Proactor says today. It did not have the ability to argue. It argued it below. The court addressed it squarely, and the court says, On the court's findings of fact, this legal theory is inapplicable. That's the Belmora legal theory. The district court says, The court has found that although the Gutierrez brothers adopted the name La Michoacana because they had seen the name in Mexico, they did not believe that the term denoted a single source of product in Mexico. The court has also found that in the United States, the name does not in fact denote a single source of product. The court has found that although Ignacio Gutierrez copied PLM's Indian Girl mark from similar marks that he had seen in Mexico and adopted it because he thought PLM's target consumers would recognize the mark, he did not believe that in Mexico the mark denoted a... but rather believed that the mark was used indiscriminately by a variety of palaterias in Mexico. The court has also found that although Ignacio Gutierrez adopted the Tucumbo statement because he had seen similar if not identical language on packaging in Mexico, he believed that various separately owned palaterias in Mexico used the language on their product packaging even though it was not literally true as applied to each of them. Finally, the court also found the absence of any credible evidence that any of PLM's advertising statements at issue influenced consumers' decisions to purchase or not purchase PLM's products or caused consumers to falsely believe that PLM's products were actually ProLacto's products. On these facts, the court cannot find any legal basis to hold without precedent that PLM as the national senior user has no rights in its marks, end quote. And you don't even need... Belmore is not a president of this court, but basically you don't need to even get to Belmore because when you think about what is a passing-off claim, a passing-off claim presumes that there is one user in the market that you're trying to pass off. In the Belmore case, Bear was the single user of Flannex in Mexico. And the allegations, and that was a 12b6 motion, and in contrast, obviously we had a three-week bench trial. We had many, many witnesses who testified live, we had a whole bunch of deposition designations that the district court looked at. The district court in this case also had the benefit of a fairly robust evidentiary record that came from the TTAB because the way this case started was an appeal from a denial of a registration, which is not at issue on appeal today because we did not appeal that. So think about what a passing-off case is. You have a single user that's somewhere else in Belmore, it is in Mexico. Here, the detailed, robust record shows that there wasn't a single user of La Mishawakana or the Indian girl in Mexico. This did not come only from Ignacio Gutierrez's testimony. This is proven through the witnesses that Prolacto put on the stand. One of those witnesses is Jorge Leon. He is the trademark lawyer for Prolacto. He took the stand and he testified at trial that approximately 30% of all of the palaterias in Mexico called La Mishawakana are not owned, controlled, or licensed by Prolacto. The district court did go back to 1991 in California. The district court's findings of fact and conclusions of law are extensive. There's at least more than 100 conclusions of fact or findings of fact. It's a very robust, detailed record. The judge, as you can see, just reading it through, you can see how careful the district court was in making each finding. The testimony came from not only Jorge Leon, the Prolacto attorney, but Guillermo Andrade Malfavon, who is one of the Prolacto principals. He's an owner in the business, one of the Prolacto family members and owners. He also testified that his company wasn't the only user of these designations in Mexico. And that was not the case in 1991. The district court makes that really clear. There's no error that the district court committed in this case. There is certainly no clear error in terms of these findings of fact. Another source of the information was from Ruben Gutierrez. If you take a look at finding of fact number 41, you will see that Ruben Gutierrez was Prolacto's key witness at trial. He was Ignacio Gutierrez's brother. And finding of fact number 41 details his incredible bias. He had personal animosity against Ignacio Gutierrez. They would get into fistfights. He testified that Ignacio Gutierrez threatened to put him in jail over a prior lawsuit that the brothers got into over business. He begged, pleaded, screamed, and cried. When Ruben Gutierrez was on the stand, he was crying and screaming. This was a very well-developed evidentiary record that considered and concluded that you cannot have passing off based on any use in Mexico because there isn't single use. Let me ask you a little bit of a different question about the Lexmark-type argument. Is there a difference between how you think that applies to false association and false advertising? Is there a difference between the zone of interest for those two different claims and the type of injury that would... I think Lexmark is... I think the district court in our case was right when he decided there was no standing on the false advertising. And I think he was right when he said that. Well, it's not standing. I mean, that's why in the case of the Supreme Court's analysis that it's not a standing question. It's a question of statutory zone of interest. Yes, which has been conflated with standing. Yes, correct. No, no, no. You're all confused on that. Standing is not at issue here. It is not a standing case. That's what Lexmark tried to get straight. Understood. Let me rephrase that. There's no prudential standing. There's no standing. It is a cause-of-action merits question, is what Lexmark said. And I believe the district court in this case correctly found that there was no cause-of-action. And for false advertising and false association, would you differentiate how it applies in those two settings? What I would say here is that no matter what the cause-of-action is, Pro-Lacto did not meet its burden to show evidence of each of the elements of the cause-of-action. The problem with the false advertising is there's no materiality, and the witnesses who actually testified, I mean, in addition to Judge Edwards' point that there's no showing of injury, I mean, that's obviously the case. There was also no materiality. Pro-Lacto's own witnesses, their so-called consumer witnesses, testified to that point. And the court's determination of a lack of materiality can be traced directly to the testimony of those witnesses. I mean, if I... Basically, La Michoacana and the Indian Girl in Mexico are to ice cream what the barbershop pole is to barbershops in the United States. I could adopt the barber pole tomorrow, open up a haircut shop. I'm not trading off of anyone's goodwill. So Pro-Lacto's entire theory on passing off, just focusing, we can talk about the other claim for false advertising as well, but their main claim I think here with Belmora is a passing off claim. You can't have passing off if the symbol or the designation is used by so many different third parties that it doesn't represent the goodwill of any one person's business. And that's exactly what this case is. And those findings, in fact, cannot be overturned. There would be nothing for the district court to go back and do in this case. It's been thoroughly done. Well, what about under... Don't they raise this? I know it's not binding, but this Virginia case, East Coast v. Rachman, which basically says that's the Caribbean Crescent case, and they say, well, where there's some regional identification that maybe legally Judge Contreras should have seen this as more distinctive in the way that the court did there. There's certainly recognition, just like there would be for New York-style cheesecake or, you know, the court also here talked about Waldorf salad. No one necessarily... People don't call to mind the Waldorf Astoria. I mean, you can understand the recognition. It functions here more like a designation of the type of product, a Mexican style of ice cream. And in terms of lack of reputational injury, it is not the case that that was not argued below. There was nothing that they didn't have an opportunity to argue or didn't, in fact, argue. One component of this trial, which the court, in the findings of fact and conclusions of law, talks about, is the pseudoscientific experiment. Let me back up. ProLacto had argued that ProLacto's products contain real chunks of fruit. And they said that because PLM's products were commercially manufactured, that PLM's products didn't have the chunks of fruit, and that caused a reputational injury for ProLacto. The district court judge permitted an experiment on the stand of melting the popsicles to see through a sieve, through a filter, to see if any fruit remained. There was fruit. So there was no reputational injury in terms of one product. We were kind of hoping you would bring some ice cream here. Well, below, I did make a motion in limine to prevent the ice cream from coming in, so I didn't want to be inconsistent with my position. So I'm sorry to disappoint the court. The evidence also, the court really looked at use in each market in the United States. We showed evidence that essentially, I mean, the court didn't characterize it this way, and I want to be careful to tell you that this is not how the court characterized it, but we had to get private investigators to prove that the statements made by ProLacto about their first adoption in certain markets in the United States was fraudulent, and we were successful in proving all of that except for one location in Florida. And because we were not able to prove that one location was false and that they had provided false evidence, the cancellation claim went against us, and we decided not to challenge that on appeal. Can you talk to us a little bit about the Tacumbo statement? And if that were not, if the district judge had not found that to be forfeit, then what's your, you know, can you still win on the merits on that claim? The Tacumbo statement, at summary judgment, the court found that PLM had not effectively, had not responded to the argument that it was false. I mean, what we explained at trial was the Tacumbo statement is really folkloric. It may be literally false, like Santa Claus is literally false. People know that isn't true, but there's this, there are lots of people. The court in this case found that there are lots of different companies in Mexico that use the Tacumbo statement, that there's this whole story, and it's actually very fascinating in a way culturally. There's this whole story in Mexico about palaterias and the genesis of popsicles and ice cream coming from Tacumbo Michoacan and starting with one family and then as a business model proliferating throughout the country and proliferating by many different small mom-and-pop shops for the most part. And, in fact, many of the Andrade Malfavon family members, some of whom banded together in 1992 to create ProLacto, operated some of the palaterias that were called La Michoacana and many other things and used lots of different designations throughout the country. So the Tacumbo statement, Guillermo Andrade Malfavon, and this is referenced in the findings of fact, he testified that ProLacto never authored the Tacumbo statement, that ProLacto wasn't the genesis of that statement, although it claims to be the heir of that idea, and ProLacto purchased its cups. There are some plastic cups that have the Tacumbo statement on them that are sold and bought in Mexico. They're sourced by an independent distributor. ProLacto buys some of them, but ProLacto is not the only purchaser of them. So like La Michoacana and like the Indian Girl, the Tacumbo statement is widely used in Mexico, and it does not – there's no evidence that consumers believe it's – Is there a fact-finding on that? Yes, there is. I would need a moment to find that. If you could just give me a moment, because I think it's in a footnote, and I think the court says that the court is aided by the testimony of Guillermo. This would be footnote 25 in the court's findings of fact, and that goes to finding of fact 66. Ignacio Gutierrez made the decision to use these statements on PLM's packaging and advertisements because he had seen similar, if not identical language, printed on containers in various palatarios in Mexico named La Michoacana. And so there's also the delay point or the forfeiture point. You argue that ProLacto inequitably delayed challenging the Tacumbo statement, and is there a record site for that where, before the district court, PLM actually argued the delay? Okay. I believe that from the beginning of the case, I just want to be clear, ProLacto's counterclaim mentioned at least one Tacumbo statement. So I do think that from the beginning, ProLacto raised the Tacumbo statement as an issue in this case. I believe that our argument is that on appeal for the first time, ProLacto is alleging that this court should apply a presumption of materiality because the Tacumbo statement was found to be false. Our position on that issue is that the presumption of materiality is waived. This is not the right place to raise that issue for the first time. Got it. The presumption of materiality is not mandatory. It's discretionary. And I think when you have a statement like this that is folkloric in nature, where there is so much evidence that it's used by other parties, this would not be an appropriate case to conclude that a presumption of materiality must be applied, and it was not an abusive discretion for the court to rely on ProLacto's own witnesses to determine materiality had not been proven. Thank you. Thank you very much. Mr. Schimmer, we'll give you back two minutes. I have to make the most of my two minutes. Your Honor, apparently there was melted ice cream at trial, and apparently there was crying and screaming and brother against brother and a lot of peripheral drama that we can see in the transcripts and in the briefs, and that can obscure certain things. So one version of the Tacumbo statement is, La Michoacana is a family company founded in Tacumbo, Michoacan, in the 1940s. And since then, we've continued to make premium ice cream, fruit, or whatever, distinguish us by our logo. This was not on packaging that PLM purchased. This was word-for-word copying by PLM onto its packaging in the United States. This is not saying this is mythology like Santa Claus, and in a 13-day trial you can forget these sorts of distinctions. So when we turn to what's entitled the Good Faith Adoption Analysis on page 99 of the decision, which paradoxically ends with the suggestion that PLM behaves unethically and immorally, there's a certain rushing and a certain missing detail. So the fourth reason for finding good faith is that Ignacio Gutierrez thought that he could make a literally false statement. And the fifth reason for good faith is that this literally false statement was not material. So things that he does in the mid-2000s, the court relies upon for its asking, what did Ignacio think in 1991? I want to sum up. This looks like a complex case. When I came to the case, I saw 18 pictures of dolls, and I'm thinking, oh, my God, this is complex. There's a forest for the trees problem here. We have estimated 3,500 locations in Mexico and perhaps 1,500 unauthorized versions that could be viewed as there's a mark that fails to function, or you could say that there's one of the most valuable brands in Mexico that gets ripped off a lot. PLM adopted La Michoacana wordmark subsequent to Prolacto. They adopted the identical girl. And by the way, we do register stylized versions of the barbershop pole in the United States. They adopt our version of the Indian girl after we adopt it. They adopt our hometown. After they visit our supplier in Guadalajara, a supplier says, are you aware of the large company, La Michoacana? Then they adopt this mark. The record is a mess. It is strewn with melted ice cream. But the arguments, the evidence that they passed off that they were aware of La Michoacana, that they put now in the United States on their push card, that they said we have brand recognition, that they said our customers will recognize the name. So just this is one of the unusual times that you can say that findings, in fact, were in clear error. But again, more importantly, if you adopt the Lexmark analysis, that there wasn't a requirement. You see how... Lexmark or Belmora? Well, Lexmark is what's controlling, and that if you, the suggested Belmora analysis on 43A1A, then you see how these factual findings were shaped by these presumptions and that they should be vacated. So in the brief you say injuries should be presumed, but now you're saying, well, or remand for an opportunity to show the injuries? In view of the court's view of the record, it would suggest that remand should allow to sharpen and shape. Well, not just the court's view of the record. So injury, I mean, I don't think there's any dispute that there's not association harm in the record. But if there's evidence of actual confusion, as there was in the Houston case, for example, then there could be presumed harm from evidence. I mean, there's testimony that we had come to a Houston supermarket and were making the freshly prepared paletas, and then PLM enters that supermarket, and customers start complaining, wait, why is there this $2 paleta here and then this packaged paleta for $1 in the front of the store? So there is a likelihood of confusion where injury can be presumed, especially in the case where there's actual confusion among head-to-head competitors. And there is evidence in the record of harm to reputation. The melting ice cream was a somewhat misthought-out attempt to show that if you have a fresh product and there's a supermarket packaged product competing with you, if you're the senior user, then you can presume injury to reputation. And I also apologize for not bringing paletas around. Thank you. The case is submitted.
judges: Griffith, Pillard, Edwards